Filed 11/20/20  In re Z.S. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re Z.S., a Person Coming Under the Juvenile Court Law. | C091251 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>V.C.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD238521) |

Appellant V.C., mother of the minor, appeals from the juvenile court's orders terminating parental rights and freeing the minor for adoption. (Welf. & Inst. Code, §§ 366.26, 395)[1] She contends the court's finding that the minor is adoptable was not supported by substantial evidence. She adds the court erred by failing to find the beneficial parental relationship exception to adoption applied. Disagreeing, we affirm.

## BACKGROUND

On October 12, 2017, after unsuccessful informal intervention, the Sacramento County Department of Child, Family and Adult Services (Department) filed a section 300 petition on behalf of the minor based on mother's ongoing and untreated mental health and substance abuse issues that endangered the minor's safety. The then 20-month-old minor had been placed into protective custody by law enforcement a few days before the petition was filed after mother engaged in violent behavior in his presence and then drove away with him unrestrained in her car. Mother had been living in her car with the minor. Relatives reported that the minor was not always fed, slept much longer than normal for his age, and banged his head against things. Mother had a substantial child protective services history including referrals dating back to 2005.[2] She exhibited volatile, delusional, and paranoid behavior.

The minor was placed with a foster caregiver for three weeks; during this time mother conducted body checks at visits and accused the visitation supervisor and foster parent of physical abuse. All of the allegations were investigated and determined to be unfounded; however, as a result of the frequent allegations, the foster parent requested the minor's removal. Thereafter, the minor was placed with relative caregivers. However, a week later, on November 13, 2017, the minor had to be placed with a second

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother has other older children who are not the subject of this appeal.

foster parent due to a shooting that had occurred at the relatives' home, rendering them unable to provide care for the minor.

Also in mid-November 2017, the visitation supervisor reported she was unable to reach mother to schedule visits. As a result, no visits were scheduled from November 15 to November 29, 2017. Mother was also missing scheduled visits and arriving late, which necessitated the requirement that she confirm visits in advance.

The juvenile court assumed jurisdiction and declared the minor a dependent child in January 2018. Mother was ordered to participate in reunification services, including dependency drug court, general counseling, a psychotropic medication evaluation and monitoring, parenting education, an alcohol and drug assessment and compliance with all recommendations of the assessment, and random substance abuse testing.

In the Department's January 4, 2018 report, the social worker reported the minor appeared comfortable in his placement with the (second) foster parent. The foster parent had reported that the minor had temper tantrums, but that they had decreased from about three times daily to once daily. On December 19, 2017, mother accused the foster parent of sexual abuse and general neglect, which resulted in four police officers responding to the foster parent's home. After investigation by law enforcement and a doctor's examination, the allegations were deemed unfounded. The experience caused the foster parent to request the minor be removed, but they later rescinded the request after discussing the matter with the social worker.

Mother's participation in visits through December 2017 and into January 2018 continued to be sporadic. She regularly failed to attend scheduled visits or arrived late. Mother was also behaving aggressively toward the visitation supervisor. When mother arrived more than 15 minutes late to the January 30, 2018 visit and saw the social worker leaving the building to return the minor to his placement, mother "snatched" the minor from the social worker's arms. Multiple security guards and social workers had to intervene.

After mother's behavior at visits improved, several observed (rather than supervised) visits occurred in March and April 2018. But on April 13, 2018, mother behaved in a hostile and physically aggressive manner toward the social worker, and her visitation status was returned to supervised. When she hit a social worker at the next visit, her visits were suspended until June 2018.

In June 2018, the social worker reported the minor's tantrums had continued to decrease in frequency to once or twice a week, and were shorter and less intense. The minor's daycare had raised concerns that the minor was biting other children and having tantrums at school. This negative behavior was more significant after visits with mother. The daycare also reported that the minor appeared more agitated and was harder to redirect after visits with mother. The minor looked forward to visits with mother and enjoyed the visits, but it was reported that, in addition to becoming agitated after challenging visits with mother, he also would be defiant, have an upset stomach and/or have emotional outbursts. The minor appeared well-bonded with mother and also had a healthy attachment to the foster mother.

In September 2018, the Department reported that mother had relapsed in July 2018. Nonetheless, she had continued with services and had been visiting regularly since visits were reinstated in June; she began unsupervised visits in October 2018. The visits were going well, and mother was consistent in attending. The minor would say "I love you" to mother at the end of visits and was transitioning back to the caregiver without incident.

However, mother was continuing to use drugs and her visits returned to supervised in late November 2018. In December the Department recommended termination of services. Mother continued to miss tests and test positive for cocaine and methamphetamine throughout mid-November 2018, December 2018, and January 2019, and was dismissed from dependency drug court on January 29, 2019. A section 366.26 hearing was set for May 13, 2019.

In January 2019, after a series of transitional visits, the minor was placed in the home of a caregiver who was interested in adoption. Visits were reduced to two a month. The minor was happy to see mother and appeared to enjoy the visits, which were generally appropriate. The minor was in good health and, in May 2019 it was reported he got along well with his peers at his daycare. But in September 2019, the minor displayed some challenging behavior at daycare, including hitting staff and attempting to run off; he was discharged from his daycare effective at the end of September. As a result, the minor was seen weekly at U.C. Davis for evaluation for unruly behavior and tantrums.

He started at a new daycare in October 2019. A few days after he started, the social worker reported she had seen him running around and crying while ignored by the other children and staff. The caregiver stated he would ease the minor into the new school routine. No further reports regarding difficulty at school were made.

The contested section 366.26 hearing took place in September and October, and concluded on December 10, 2019. Mother testified the minor called her "mom," told her he loves her, and was excited, hyper and talkative at visits. He played with the toys she brought and ate almost all the food she brought to visits. She testified he did not want their visits to end, demonstrated by his unpacking his bag and putting his toys back on the table, and playing like he was not yet done with the visit. The social worker testified that the minor was continuing to adjust well in his prospective adoptive caregiver's home. Mother's allegations of physical abuse and neglect against this current caretaker had been investigated and deemed unfounded, and the social worker had no concerns about the minor's safety in the caregiver's home.

The juvenile court found the minor adoptable and that no exception to adoption applied. The court terminated parental rights and ordered adoption as the permanent plan. Mother timely appealed.

## DISCUSSION

### I

### *Adoptability*

Mother first contends the orders terminating parental rights must be reversed because there was insufficient evidence to support the juvenile court's finding that the minor is adoptable. She focuses on what she characterizes as a "severe and significant decline" in his behaviors, arguing that "a previously adoptable child quickly became unadoptable" after his transition to the new caregiver. We reject the claim of error.

A. *The Law*

"If the court determines, based on the assessment . . . and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) "Although a finding of adoptability must be supported by clear and convincing evidence, it [i.e., the determination that it is likely the child will be adopted within a reasonable time] is nevertheless a low threshold." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

Determination of whether a child is likely to be adopted focuses first upon the characteristics of the child; thus, a finding of adoptability does not require that the child already be in a suitable home or that there is "a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) On the other hand, the fact that a prospective adoptive parent has shown interest in adopting a minor is substantial evidence the minor is likely to be adopted within a reasonable time, either by that parent or some other. (*In re J.I.* (2003) 108 Cal.App.4th 903, 911; *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154; *Sarah M.,* at p. 1651.)

We review the juvenile court's finding on this issue under the substantial evidence standard, giving it the benefit of every reasonable inference and resolving any evidentiary conflicts in favor of affirming. (*In re I.I.* (2008) 168 Cal.App.4th 857, 869.) That is, we

6

must determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1232.) If so, "[i]t is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B., supra*, 173 Cal.App.4th at p. 1292.)

While the issue of adoptability usually focuses on the minor, "in some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*Sarah M., supra*, 22 Cal.App.4th at p. 1650.) "Where the social worker opines that the minor is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any legal impediment to adoption by that parent [citations]. In such cases, the existence of one of these legal impediments to adoption is relevant because the legal impediment would preclude the very basis upon which the social worker formed the opinion that the minor is likely to be adopted. [Citation.]" (*Ibid.*)

The term "specifically adoptable," therefore, denotes a child who but for the existence of a prospective adoptive parent would not be adoptable. The suitability of the prospective adoptive parent is not an issue when the child is generally adoptable, but it may be placed in issue when the child is specifically adoptable.

B. *Analysis*

This is not a case where the juvenile court found the minor specifically adoptable; the parties do not dispute that the court made a finding that general adoptability had been proven by clear and convincing evidence. Mother's challenge to this finding that the minor is likely to be adopted within a reasonable time centers on what she characterizes as the "severe and significant decline in [the minor's] emotional state and behavior over the year preceding the juvenile court's termination of parental rights." She speculates

7

that this decline "does not bode well for [his] general adoptability," because if his "placement with the prospective adoptive father fails (or has already failed), his severe behaviors requiring intensive services and therapy and resulting in expulsion from at least one school are not likely to make it any easier for [him] to find a new adoptive placement."

Although it is certainly concerning that the minor's emotional health has fluctuated over his years in the dependency system, that fluctuation and emotional turmoil is not at all unexpected given the circumstances under which the family finds itself and the fact that the minor has had a number of different caregivers and daycare experiences. Further, he was on the cusp of being reunited with mother when her ongoing relapse ended the progress toward reunion. Because mother admits that the minor "probably was an adoptable child before he was moved to his prospective adoptive home in January 2019," we focus on more recent events that mother now claims have rendered him no longer likely to be adopted.

While it is clear that mother has blamed various caregivers for the minor's various physical and emotional issues, including the prospective adoptive parent at the time of the challenged findings, the issue of adoptability focuses on the characteristics of the *child* and whether there are problems such as "age, physical condition, and emotional state" that would make it difficult to find a willing adoptive parent. (*Sarah M., supra*, 22 Cal.App.4th at p. 1649.) A finding of adoptability does not require that the child already be in a preadoptive home. (§ 366.26, subd. (c)(1).) What is required is the likelihood of adoption within a reasonable time. (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223.)

The record does not reflect that events occurring after January 2019 have rendered the minor unadoptable; in fact, the record is to the contrary. The most recent report prepared for the hearing at issue here described the minor as "a somewhat shy, quiet, and friendly child" who enjoyed going to the park and playing, cars and superheroes. He was

8

reported to be physically healthy and was meeting developmental milestones. He followed verbal directions and was encouraged by the caregiver to sing and communicate verbally. There were no concerns regarding his mental health or intellectual status. He generally got along well with peers at his daycare and had age appropriate tantrums at school or home if he did not get what he wanted. Although it is true that during his first few days at a new preschool, he was observed to be crying and ignored by peers and staff, the record does not contain evidence that the then-three-year-old minor continued to have behavior problems at the new school. The caregiver reported no concerns regarding the minor's behavioral or emotional functioning.

The Department concluded that, due to the minor's young age, good health, and lack of any significant developmental, educational and behavioral challenges, he is adoptable. The juvenile court so found, and the evidence supports that finding. Further, the fact that the current caregiver has shown interest in adopting a minor is substantial evidence the minor is likely to be adopted within a reasonable time, either by that caregiver or some other. (*In re J.I., supra*, 108 Cal.App.4th at p. 911; *In re Lukas B., supra*, 79 Cal.App.4th at p. 1154; *Sarah M., supra*, 22 Cal.App.4th at p. 1651.) Mother's arguments to the contrary are highly speculative.

Mother contends the evidence established that the minor was having tantrums that were dangerous to his well-being and had developed these tantrums only after being placed with his current caregiver. Thus, she argues, he now had such special needs that a permanent caretaker would be difficult to locate. She points to two tantrums: a September 2019 incident wherein the minor scratched his own face and an October 2019 incident where the minor was banging his head on the wall during the social worker's conversation with the caregiver.

Neither the frequency nor severity of these incidents renders the minor unadoptable. The prospect that the minor may have some continuing behavioral problems does not foreclose a finding of adoptability. (See *In re Jennilee T., supra*,

9

3 Cal.App.4th at pp. 224-225.)  Further, as we described at length above, the minor had a history of tantrums, and their frequency had actually *decreased* significantly (from three a day) since the time of his initial placement.  The minor was participating in weekly evaluations at U.C. Davis for his unruly behavior and tantrums.  His behavior did not render him unadoptable at the time of the juvenile court's ruling, and any assertion that it would do so at some point in the future is purely speculative.

II

*Beneficial Parental Relationship Exception*

Mother also contends the juvenile court erred by failing to find the beneficial parental relationship exception to adoption applied.  We find no error.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]'  [Citation.]  If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child.  [Citation.]" (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child."  (§ 366.26, subd. (c)(1)(B).)  Such circumstances include when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(1) [beneficial parental relationship exception].)

To prove that the beneficial parental relationship exception applies, the parent must show there is a significant, positive emotional attachment between the parent and child.  (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.)  And even if there is such a bond, the parent must prove that the parental relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a

10

permanent home with new, adoptive parents.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); accord, *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1345 (*Jasmine D.*).) "In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.,* at p. 575.) On the other hand, "[w]hen the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent/child relationship, the court should order adoption." (*Jasmine D.,* at p. 1350; *Autumn H.,* at p. 575.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Jasmine D., supra*, 78 Cal.App.4th at p. 1350.) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53, quoting *Jasmine D.,* at p. 1348.) The beneficial parental relationship exception to adoption is an *exception* to the general rule that the court must choose adoption where possible, and it " 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R.,* at p. 53.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in

weighing that evidence and determining detriment. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

We have noted above that mother's visitation was often not "regular" as required by statute to apply the exception at issue here, but even if we assume for the sake of argument that mother met her burden to establish regular visitation with the minor, we reject her argument that the exception applied here. Mother did not meet her burden to establish that the minor had such a significant, positive emotional attachment to her that the benefit of maintaining it outweighed the benefits the minor would obtain from adoption. (See *Autumn H., supra*, 27 Cal.App.4th at p. 575.) Considering, as the juvenile court must, factors such as the age of the child, the portion of the child's life spent in the parent's custody, the positive or negative effect of interaction between the parent and the child, and the child's particular needs (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811), the court did not err in determining the beneficial parental relationship exception to adoption does not apply.

At the time of the section 366.26 hearing, the three-and-a-half-year-old minor had been out of mother's care for two years--over half of his short life. Although the minor was described as "well bonded" with mother and enjoyed his visits with her, it is undisputed that his negative behavior at school increased after some visits with mother and that he was agitated, defiant, and prone to emotional outbursts and intestinal illness after some of the more challenging visits with mother (where she was aggressive and inappropriate with those in attendance). This is not the type of significant, positive attachment that has been held sufficient to support an exception to the preference for adoption. (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Simply put, mother has not established this case to be "an extraordinary case" such that preservation of parental rights must prevail over the Legislature's preference for adoptive placement. (*Jasmine D., supra*, 78 Cal.App.4th at p. 1350.)

12

## DISPOSITION

The orders of the juvenile court are affirmed.

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Mauro, Acting P. J.

_____/s/_____
Murray, J.